v. Donald J. Trump, President of the United States, et al. Mr. Garrahan for the appellants, Mr. Hitchelwood for the accolades. Good morning. Good morning, Your Honor. May it please the Court, Andrew Garrahan for Petitioner Appellant Abdulsalam Al-Hela. I'd like to reserve two minutes of my time for rebuttal. Unlike every other case that's been before this Court that has upheld a petitioner's detention, the District Court did not conclude that Abdulsalam Al-Hela was a part of any organization. His detention is based solely on the idea that he provided substantial support to a group, only on the substantial support standard, a standard on which almost no law exists. Delegations themselves relate mainly not to al-Qaeda, but to two groups. If we looked at it under a part of, why would it be any different? If it was an alternate ground? Your Honor, the part of standard, this Court and the courts in this circuit have made a lot of decisions of what it is to be a part of. It doesn't take much. Say that? It doesn't take much in this setting, right? It is a functional test, Your Honor, but Abdulsalam doesn't... Being in the same safe house you're a part of, right? That is what the Court has found, and those sort of circumstances are not present here. So Abdulsalam was never found to be in a safe house or in a training camp or on a battlefield fighting Afghanistan, any of the circumstances where this Court has previously... Well, it clearly doesn't have to be engaging in personal hostilities, right? I'm sorry? It doesn't have to be personally engaging in hostilities. We've never required that. No, we would not say... The Court's not said that personal hostilities are necessary. We would say that substantial support, though, does require either combat or participation, not necessarily combat and hostilities, but it needs to be in hostilities against the United States. That is how... And where do you get that from? Yes, Your Honor. So in al-Bahani, this Court has said that substantial support is support that is in hostilities against the United States. In al-Ali, they described it as support in the war. And the government, in the report in 2016 from the White House, referred to it as being in armed conflict against al-Qaeda and other groups. Yes, the entity that you're supporting or that you're part of is engaged in that, but you yourself don't need to be firing the missile or shooting the machine gun. We've never required that. Well, so there's only really been one substantial support case before this Court, before, Your Honor. That was al-Bahani, where it was upheld. And in that case... No, I mean, say, in the part of cases. You just need to be part of an organization that does that. You don't need to lift a weapon instead of helping them to be part of it. So that is some of the opinions. There have been decisions where somebody doesn't have to be fighting on a battlefield, but it still needs to be. In those cases, we'd say there's a difference between being a part of an organization, which is sort of a status when you're a part of something, you're in it, and the Court would attribute in those cases what you've joined, you're supporting that. Support here, we would say, is different, though, Your Honor. Under the law of war, for example, we'd say that somebody who's not a combatant, not engaged in hostilities, as the district court explained, you can be detained if you were accompanying enemy forces when you were captured, or if you were engaged in conduct that made you an imperative threat to security, such that your detention was absolutely necessary. And then, even under law of war, that's more of an internment, in fact. And looking at the Geneva Conventions, it would be when that person has been determined that they're no longer absolutely necessary to be held, and if you're released, it's not an end of hostilities standard in that case. And that's why support is different. It also, in the decisions that the government conceded and the district court held in the Gurevi case, that you have to be essentially a part of the enemy armed forces. So, actually, it's not a big range of difference. It's necessary to provide people detention of civilians who might be supporting a war effort from people who are taking part in the actual hostilities. There's a difference between who can be detained there on one side and the other. And so substantial support is just a very narrow basis for detention. And it also has a temporal element. So we've been talking a lot about the conduct, the things you have to do. You need to be engaging in hostilities and then being an imperative threat. But it's also a temporal element, which means, for example, it has to be in the hostilities that are authorized under the AUMF. So that's something that's in the war that started with September 11th. And it also needs to be ongoing at the time of the detainee's capture, as the district court held and as this court has held before, that it needs to be ongoing. And Abdul Salam's allegations against him, especially as related to this organization EIJ, where he's alleged to have engaged in some travel facilitation for the group, doesn't meet that standard. It doesn't really even rise to support under any definition of it. So Abdul Salam, you know, giving a little just brief background on him, he sort of straddles two worlds in Yemeni society. He is both a sheikh of a tribe, the tribes in the capital city, and he's also a sort of a politician, but he has close relationships with the internal security forces in the country and with the ruling party. And so he bridges these two worlds. When Yemen was looking to, as under pressure from possibly from the West, to sort of move foreign Arabs out of the country, the government turned to Abdul Salam and other sheikhs like him to try to ask that they help with that process. And so he was doing it at the behest of his government. The United States was aware that Yemen was deporting these men and didn't intervene in the process. Al Qaeda and any other group didn't ask for this to happen. He's not sending people out on missions or to fight in Afghanistan. He's not deploying them in any way. So it's not supportive. It's undermining these organizations and these individuals in Yemen when he is asking them and helping them to leave the country. Nor is it found at the district court that he posed an imperative threat whose detention remains absolutely necessary. And there's, I don't believe, any allegation that there's a nexus to September 11th or to any hostilities against the United States as part of that travel program, which also was not ongoing at the time of his capture. The travel relates largely to, if not exclusively, to events in the 1990s. All of the arguments you just made are factual arguments. What's our standard of review for these? This is a de novo question. It's a legal question, Your Honor, about whether this amounts to substantial support. And it does not. Like I said, it's not really support at all. It undermined these groups and these organizations. But on the legal question there, it doesn't make him a combatant. It's not engaging hostilities. It's not ongoing at the time of his capture. So that would make him not as to the travel. But I thought the gravamen of your argument was that there are certain things the district court found that he did that you say he didn't do. And under that, it was part of your argument of substantial support, but if the district court found that he, in fact, didn't do the things that or he did do things that you're claiming he didn't do, what's our standard of review for that? I may have misspoken. I did not mean to imply that we're saying that what he did is not support. Even if you believe what the district court found him to have done, it's not substantial support, Your Honor. Sorry. Thanks for letting me clarify that. He's also alleged to have engaged in activities with a group called the AAIA. I'll talk a little bit about why those activities were not support. I'd like to hold that for the closed session, if I may. But the AAIA also, you know, the way the standard works is it has to be found to be an associated force of al-Qaida or the Taliban. No allegation related to the Taliban here. But it only supports detention if AAIA is an associated force of al-Qaida, and it's not. Associated force also has sort of a conduct piece to it as well as a temporal piece to it. The conduct piece is the group has to be a co-belligerent in the current hostilities with the United States. I see that I've – okay. It has to be a co-belligerent in hostilities against the United States in this comprehensive armed conflict, that is the September 11th conflict. That's why every time there's been an associated force case before this court, it's been a group that is fighting in Afghanistan against the United States and its coalition partners after September 11th. So co-belligerency means fighting alongside of. It's things like joining them on the battlefield, acting as their agent, providing systematic military support to them. So in Parhat, when this court considered whether a group was an associated organization, the government argued and the court actually seemed to accept that associated meant that they effectively become the same organization. It's not enough that an organization engages in terrorism or embraces the ideologies of or praises activities of al-Qaida. They need to go beyond that to actually be working together. And, again, there's a temporal element. So it has to be in the September 11th, the conflict that starts with September 11th, authorized under AUMF. It also has to be, though – the organization has to be an associated force at the time that the alleged conduct has occurred. That's in the NDAA, that you're a substantially supported and associated force engaged in hostilities against the United States. Counselor, can I ask you about your due process argument? Yes, Your Honor. Yes, Your Honor. So if we were to assume that some kind of due process rights apply in Guantanamo, what standards would you suggest that we use to determine that question, and what cases would you rely on for that? To determine whether due process applies? Yes, Your Honor. Well, assuming it applies. Oh, assuming it applies. What would be the standards for assessing whether due process was afforded? Sure. So we'd say a few things. Whether evidence – whether there's been reliance on unreliable evidence, that can raise a due process question. So we'd say that, for example, the hearsay in these cases – and I know this Court said that hearsay is always admissible but needs to be reliable hearsay. And there's sort of a combination of factors here that make a lot of the evidence that's involved in these cases, and in this particular case, I'm sorry, not reliable, or at least the Court was not able to properly assess its reliability. Are any of those different than the analysis that was conducted under the suspension clause? Does it make a difference in this case? We'd say that, as far as procedural matter, that the suspension clause, meaningful opportunity rights, are really coextensive with procedural due process. So if they're coextensive, there's nothing you would get that you haven't already gotten if we said the due process clause applied here? Well – On these facts, on this case that you're arguing. Your Honor, we would say that there are things that, whether you're looking at it through a suspension clause point of view or – How would it make a difference here? If it was looked at through due process clause instead of suspension clause, what difference does it make for your client? I can't – I'd like to – I want to be careful about getting into information that might be classified, but there's a large amount of ex parte evidence in this case, in particular information about sources that has been withheld from us as counsel of security clearances. And you think that that would be different under the due process clause? We think that either way, there's an opportunity to have an opportunity to know – I mean, at the national security matters, ex parte is used commonly, and no one's thought that that's a violation of due process. Your Honor, that is true, but in those cases, there needs to be some sort of opportunity to respond. There needs to be a meaningful – or a substitute given that still gives you an opportunity to respond. Well, in this case, the case management order allowed counsel to seek declassification. Did you seek it beyond the general request that the return be declassified? Did you tailor it in any specific way? Yes. This case, part of the reason that, you know, we're here 18 years later is that there's a long period of time in this case where the district courts were reviewing information in this court about – for declassification review. And some was declassified, but large amounts still were not. And, Your Honor, the other thing is that it was – we have – And what's the due process violation in that? That seems to me to be the very nature of due process when you have a national security matter. Well, due process would still require an opportunity. You have an opportunity to seek declassification. You make your argument to the court, and you lose. That happens. It does happen, Your Honor, we're aware. And that's a violation of due process? Well, the – even when that happens, there needs to be a chance to be able to have some substitute to argue so that you can argue about what's actually happening with this evidence. So we've got ex parte evidence and hearsay and no ability to confront the person who's doing it. So you're not able to test, for example, the hearsay through the adversarial process when you can't know any information about the person who's speaking, who's conveying that hearsay. Due process requires at least an opportunity to respond, even if it's not obtaining that ex parte information. We'd also say, Your Honor, that some of this is arbitrary. Maybe we can take this further up in the closed session. Okay. But I'd like to have some sense of how you think the due process clause would have led to a different result here than the suspension clause analysis did, because – anyway. Before you sit down – Yes, Your Honor. You said that the suspension clause is coextensive with the Fifth Amendment due process clause. Where do you get that from? We'd say that this – under Bermudian – Maybe I misheard you. Maybe I spoke a little too loosely when I said it was coextensive. We'd say, though, that the procedural rights are at least as broad as the due process rights. It's guaranteed in the sort of idea of having a meaningful hearing under Bermudian. The suspension clause says that the writ shall not be suspended except in times of war. And I forget what the rest of it is. But that's the writ as it existed in 1789. The Supreme Court in Bermudian went through a historical analysis of the extension of the writ beyond the sovereign territory of England at that time. What historical analysis can you come up with that indicates that these procedural rights you're talking about were part of the writ as it existed in 1789? Your Honor – Do you have any historical basis for saying that? Your Honor, I would just point to Bermudian where it said that the suspension clause guarantees a meaningful opportunity to make the case here, Your Honor. That tells you nothing. Meaningful as compared to what? As compared to not having the writ of habeas corpus. But meaningful as of 1789? And I guess your answer is you have no historical support whatsoever for the proposition you're putting forward here. Your Honor, the name of the case escapes me, but this Court describing the suspension clause and the rights under habeas talk about, I believe, is a tree with many branches and that Bermudian and these Guantanamo cases have a new branch of the tree that is grown, so it's not confined solely to that, what it was in 1789. It's a living suspension clause? Is that what you're saying? I'm sorry, Your Honor? It's a living suspension clause? I guess if the tree is living, then yes, it's a living suspension clause, Your Honor, yes. Thank you. I'm not sure that's what Judge Brown meant in Al-Bahami when she wrote that. Thank you, Your Honor. We'll give you back a couple minutes. We'll hear from the government now. Good morning, Your Honors, and may it please the Court, Brandon Schwinn for the government. The evidence in this case establishes that the petitioner here was both part of and substantially supported Al-Qaeda and associated forces, and I'm looking forward to discussing that evidence in more detail in the closed session. For present purposes, I'd like to start where the petitioner started, and I think the Court spent the bulk of its time, which is the question of the substantial support standard. Of course, as Judge Griffiths was pointing out, if this Court rules that al-Hila is part of Al-Qaeda, those questions aren't implicated here. But does the Court recognize in Al-Bahami the evidence that's going to demonstrate someone's both part of and substantially supported Al-Qaeda and associated forces frequently will overlap, frequently will have individuals who their conduct would establish both standards, and this case is, I think, an example of exactly what this Court had in mind in Al-Bahami. To respond to some of the petitioner's points here, there's no particular temporal limitation drawn from the text of the AUMF or the NDA itself that would support the kind of limitations that the petitioner's trying to read into those provisions. And it's certainly true, as the District Court found here, that this petitioner was involved in support activities over a period of years, had a long established track record of these activities right up to just a few months before 9-11. So even accepting the premise that hostilities only began on 9-11, which of course is not the government's view, even accepting that premise, the District Court recognized there's no indication that petitioner here stopped providing support, did anything to dissociate himself from the organizations that he had supported, or did anything to otherwise terminate the kind of assistance he was providing and had a long track record of providing prior to 9-11. Moving to the specific questions about associated forces, the District Court here again looked through the evidence, much of which frankly is not seriously contested about how those forces came to be associated with al-Qaida and how they interacted with al-Qaida, and properly concluded that the facts that it found as to those organizations rose to the level of substantial support that both those organizations, after bin Laden's fatwa in 1998, either signed on to the fatwa or expressed support for bin Laden and began to target Westerners to engage in attacks on Western targets, including the U.S. Embassy in Albania, the British Embassy in Yemen, kidnapping of Western tourists in Yemen. So these organizations did in fact begin to join that fight and were in fact associated forces of al-Qaida, as the District Court properly found. Unless there are specific questions about the due process. Yeah, there are. There are. So why doesn't due process clause apply here? Well, there are a couple of points. So petitioners advanced, I think, two different due process arguments. So the procedural due process argument. That's the one I meant to say, procedural due process. So just as an initial matter, Your Honor, that argument's been forfeited in this case. The petitioner didn't advance the procedural due process argument in District Court. There's a reason there's no opinion from the District Court assessing the procedural due process argument. The most that they pointed to in their reply brief, for where they raised such an argument as a passing reference to due process in a couple of motions without any developed argument. So that argument's forfeited here, just as a similar argument was forfeited in al-Awli. So even if this Court were to set aside, excuse the forfeiture in this context, there are two additional points about the procedural due process argument. One is that the process that was provided here far exceeds anything the due process clause would guarantee, even if it applied in this context. And we know that in part by looking at the Supreme Court's decision in Hamdi. So there, in describing the process that was due to a U.S. citizen detained in the United States, the Supreme Court laid out a set of procedures. I'd like you to back up and tell me why you think the due process clause shouldn't apply here. What's the argument? You're saying if it did, the process was adequate. I understand that, but I want you to deal with the issue that Judge Rau and I have raised about whether the due process clause applies. Right. How are we supposed to think about that? How are we supposed to decide that? Your Honor, the Supreme Court has, in numerous decisions, and this Court has in other decisions, made clear that the due process clause doesn't apply to individuals without property or presence in the United States. Guantanamo fits that bill. My understanding is that Petitioner thinks Boumediene somehow dictates a different analysis, but the analysis that was given in Boumediene was specific to the suspension clause. That's what the case was about, but the Court, as I read Boumediene, the Court gave us a way to think about this, right? We're supposed to see if the asserted constitutional right would be impracticable or anomalous in this setting, and we're supposed to make certain that there's an opportunity for meaningful review. That was the analysis that some of the judges on this Court used in the ex post facto case to find that the ex post facto clause did apply there. Why shouldn't we use that analysis to determine whether the due process clause applies? Your Honor, because the suspension clause, as the Supreme Court made clear in Boumediene, has a unique quality about it. It's unique in terms of its importance to the separation of powers, and it's unique in being in the Constitution at the time it was ratified, unlike the Fifth Amendment, which, of course, doesn't come until later. So the fact that the suspension clause might have a different scope and different set of protections. I'm glad you didn't say, and it's only an amendment to the Constitution. No, amendments count, too. I'm not here to dispute that. Isn't there an easy answer? I mean, you're dancing around it, but there's a direct answer to the question. It's Johnson v. Eisentrager. It's Verdugo. And it's Zavidas. There's three Supreme Court cases saying that the Constitution does not apply beyond the sovereign territory of the United States to aliens, combatants or otherwise. Right. That's the next part of the answer. So the first part is just to address why. No, not at all. Let me drop a footnote to that. There's a case, you know, a lot of these cases I can't pronounce the names. And I'm also curious about why some of them are al-Bahani v. United States and others are al-Bahani v. Obama or al-Bahani. Do you know what the – It may just be an artifact of how cases were titled when they were filed. In 1789. There's an opinion by Judge Henderson, and I'm going to try to pronounce it. And I don't remember whether you cited it. It's al-M-A-D-H-W-A-N-I. On my money, yes. Okay. Did you cite that case? I believe we did, but I'm not quite sure. The argument there is Guantanamo v. Payne 8. The argument there was that under the Due Process Clause, the evidence which was not made part of the record was a violation of the Due Process Clause during the military commission hearing in Guantanamo. And the court unanimously rejected that argument, which relied on Garner v. Louisiana, which is a procedural due process case, rejected that argument, citing Cayimba, and held that Cayimba ruled that the procedural due process clause does not apply to Guantanamo. Right. Can you possibly square that with the Quasim case? Your Honor, I believe Magwane was discussed a bit in the Qasim decision. Obviously, the court in Qasim concluded that that question remained open under circuit precedent. Of course, we've also pointed out that this court has, in other contexts, for example, in the People's Mojahedin case, applied the same Produgo and Eisentrager analysis to procedural due process claims, so we don't think there's any reason. Which was not cited in Qasim. That might be correct. I don't remember exactly whether that case was cited or not. But certainly, because the suspension clause is a different type of constitutional provision, that's sort of what motivates a lot of the analysis in Boumediene that's not present for something like the Fifth Amendment, where, as you point out, the Supreme Court has repeatedly declined to extend those protections outside the United States' borders. Now, of course, again, as we say, those arguments, particularly as to procedural due process, were forfeited here. And in any event, the procedures that were given here far outstripped those that were envisioned in Hamdi as satisfying due process. So I don't know that it's necessary for the court to reach that question. Do you know how many detainees are now being held at Guantanamo? The exact number, I'm not certain. I believe it's something like 40. But they're not all being held under the authorization to use military force, are they? I don't know the answer specifically to that question. I mean, one of the submissions of counsel here is that when hostilities end, then the person is not being detained for punitive purposes, and that person would be released from Guantanamo. But some of the perpetrators of the bombing on 9-11 are not going to get released even if hostilities end. Your Honor, if someone were, for example, serving a duly imposed sentence from the military commissions, I could imagine them not being released at the termination of hostilities. I don't know exactly what the facts on the ground are as to that. But, I mean, certainly everyone agrees that, by and large, absent some circumstance like that, at the end of hostilities, the authority to, you know, hold people under the law. I just wonder how that squares with the way we handled detainees in World War II. The Eisentrager case dealt with civilian employees, German civilian employees, who were tried and convicted and held in the Landsberg prison, which at one time had 600 prisoners there, and a good many of them were executed. I mean, how does that square with the idea that you get released when hostilities end? And, by the way, are the hostilities ended with the Taliban then? Your Honor, that case, that particular question isn't implicated here because the evidence, with respect to this petitioner, relates to Al-Qaeda and associated forces. That was a rhetorical question. You know, in terms of your specific question about Eisentrager, I certainly agree that it's difficult to square an extension of the Fifth Amendment to Guantanamo with that decision. That's, I think, part of why, you know, when the Boumediene Court spent so much time focused on the suspension clause, that's a good reason to believe that when it focused on the suspension clause, it meant its analysis to apply to the suspension clause and to take seriously its admission that it was not deciding, you know, the substantive content of the law or other questions. Did you take issue with those judges in this court, in Al-Ghul, that used Boumediene to say the ex post facto clause applied? Was that mistaken? Your Honor, I would hesitate to give that— That was Justice Kavanaugh, by the way. Right. I'd hesitate to give a definitive position on that. Well, no, but I mean, it's important. I mean, the question is, is Boumediene solely about the suspension clause, or does it tell us that it's possible that other constitutional protections apply there, but one has to use the same analysis that the court went through to say that the suspension clause applies there? Your Honor, my understanding— It's reading Boumediene, which we've been trying to do for a long time, right?  My understanding is that in Al-Ghul, the government didn't sort of contest the notion that that same analysis could be used, but believed it prevailed over the analysis anyway. Whether or not that's true, it still wouldn't answer the question of whether, you know, again, the ex post facto clause, which, like the suspension clause, exists in the Constitution at the time of its ratification and might protect a certain set of rights independent of what the Fifth Amendment protects, that wouldn't really inform the Fifth Amendment analysis, particularly where the Supreme Court has repeatedly declined to extend Fifth Amendment protections outside the United States. Now, again, I'd just like to return to the point that the procedural due process argument here in particular has been forfeited, and I don't believe the court necessarily needs to— Counselor, in the cases in which the Supreme Court has declined to extend the Fifth Amendment, was there any distinction made at all in any of those cases between so-called procedural and substantive due process? Not that I'm aware of, Your Honor, no. If there are no further questions, I'll move forward to the closed session. Thank you. Thank you. Thank you. I'd like to first address the waiver issue here. I think that it's clear if you look at the documents that we cite in our brief that this procedural due process question is not waived. It was raised below, and we've made procedural arguments throughout this case. And then the court below decided that, in fact, it was not going to give us documents that we're asking for under due process, and that this court should indulge presumptions against the waiver of rights, such fundamental rights as due process. Can you explain to me the distinction that you're making between what you call procedural due process claim in this context versus a substantive due process claim in this context? Sure. Yes, Your Honor. The substantive claim here is that, as the Supreme Court outlined in Salerno, the idea that once a detention has exceeded its purposes, it becomes impermissibly punitive. It's an impermissible restriction on liberty, and that's what we have here today. Because of Bill Salam, it's— It's like an Eighth Amendment challenge. This is a question—I mean, we would allege that— or we would say that there probably are some Eighth Amendment issues here as well, but that's not the focus of where we are. It's that Bill Salam is being held as necessary and appropriate under the AOMF, as the courts have described it. And because he is not a combatant, he's a civilian, as the district court explained under the law of war, there's really only two ways to hold somebody like that. He can either have been captured while he's accompanying enemy forces, which essentially makes him more like a combatant or a POW, or it can be when he is—and that's not alleged— and that he can be an imperative threat to security. But as described, that's really more of a— I'm sorry, he can be an imperative threat to security such that his detention is absolutely necessary in those hostilities. But that's really not a detention at all. It's an internment until he is no longer a threat, until that threat has ended. So it's not until the end of the war. So we'd say that under Salerno, he can't just be held until the end of the war indefinitely. He needs to be released when that point has been reached, and that point has been reached, and thus it's impermissibly punitive. And that's the main substantive—the thrust of the substantive due process argument there. There's also, obviously, that— Does it do any work to say that that's a substantive due process claim as opposed to just a due process claim where you're being deprived of your liberty without due process of law? You know, I'm not sure that— I'm just wondering what work the distinction makes between procedural and substantive due process in this particular detention context. Sure. I'm not sure that it necessarily does a big difference to call it substantive versus procedural. The issue is that he's been deprived of liberty unjustly, and there's some—I guess the difference is that substantively we'd say there's some deprivations of liberty that are just impermissible no matter what the process involved is, and that's where the substantive piece of it comes in, Your Honor. I also would like to address the application of the clause in general. I think, Judge Griffith, you laid out the test that we would recommend, which is that Boumediene says that when you're applying the Constitution at Guantanamo, it's a practical test. It's how Boumediene reached the idea that the suspension clause applies, and that's how a majority of the— And when we get in the closed session, I want you to tell me how that makes a difference here. Because I don't— Sure. Yes, Your Honor. And I understand, Your Honor. Yes, absolutely. And the—it's how the majority of the judges sitting on BAC in this court, in Malibu, including in Judge Rogers's concurrence in that case, agreed that the ex post facto clause should apply, and it's the same here. It's a practical consideration, and the practical consideration is— What do you do with your friend's argument that both ex post facto and suspension clause are different than the Fifth Amendment because they're part of the original Constitution and part of what the writ of habeas corpus meant to the framers, as Judge Randolph has pointed out? Your Honor, I'd say that it's all in the Constitution, and Boumediene didn't draw a distinction between, well, this is an amendment versus, as you said, this is an article— But it was looking at habeas, right? Habeas is different. Habeas is ancient. Habeas is historical, and aren't we supposed to be engaged in a historical inquiry when we're talking about what rights adhere during the habeas process? Well, Your Honor, I think that the Boumediene test is saying broader than that, that the Constitution can apply to people who are detained within the territory of the United States and that the way you decide whether it applies or not, particularly in Guantanamo, is looking at it in this practical way and whether it would interfere with the military mission at Guantanamo, and extending due process in this case would not interfere with the military mission at Guantanamo. This is particularly in Abdul Salam's case for reasons that I'm happy to explain in more detail in the closed session, Your Honor. So it's just the due process clause in the Fifth Amendment, right? Not the double jeopardy clause? Well, we're only addressing the due process issues here today. Not the right to remain silent? The privilege of self-incrimination? Why is it that these other parts of the Fifth Amendment don't apply, but only the due process clause does? We're only addressing the due process issues. Some of those we'd be getting into arguments about is this criminal versus civil proceeding and things like that. So here it's just the focus on due process in the Fifth Amendment. Well, I don't know if that's a sufficient response because if you read Justice Jackson's opinion in Eisentrager, he said if we apply the Fifth Amendment to aliens who are outside the sovereign territory of the United States, there would be no legitimate policy or legal basis for not applying all these other amendments, like the Second Amendment, the right to bear arms, or the Eighth Amendment, and so on. And he went through them, each one. So he thought and the Supreme Court majority thought that an argument against applying the Fifth Amendment was the argument that if we do that, if we take that step, there's no stopping point. And I'm asking you, what is the stopping point? Your Honor, in Eisentrager— And a right to jury trial. In Eisentrager, I guess I would say, it may sound like a broken record, but to go back to Boumediene, it's a practical consideration. And so as those questions would come up, those should be practically considered. And some of them it seems like would be maybe impractical to do, but those aren't, and maybe not. And those are not questions that are currently here with us. In Eisentrager, also, it's where— Is that a legal argument, a practical consideration? Yes, Your Honor. In Boumediene, when the court was describing how it was going to decide whether a suspension clause applied, it asked questions about how the detainees were being held and where they were being captured, and then what the practical implications would be of applying that portion of the Constitution. In this case, all the other facts are the same as they were in Al-Ghul and in Boumediene, as far as the details of—not specifically exactly the same, obviously, but the general outlines of where they were captured and certainly where they were being held, which is at Guantanamo. And so it boils down to this practical question. So there was a lot of evidence that's secret that we can't talk about in this open session, and other evidence that you haven't seen that's top secret. And by way of hypothetical, let's suppose that there are various and sundry generals and CIA agents and also informants involved in all of this, and you want access to that information and you want a due process trial where the individual faces his accusers, right? Aren't they practical considerations that argue against the due process clause, that you'd have to bring all these people in to a public trial? Your Honor, I'd really prefer to address that in the classified session so I can talk about details particular to this case. Okay. But, you know, this— Don't forget. I will address that question, yes, Your Honor. I think we will now adjourn. I'll let the Court prepare for the closed session. Thank you.
judges: Griffith, Rao, Randolph